# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

BALMORE ALEXANDER VILLATORO,

    Plaintiff

v.

PRESTON, et. al.,

    Defendants

Case No.: 3:16-cv-00531-MMD-WGC

**Report & Recommendation of
United States Magistrate Judge**

Re: ECF No. 96

This Report and Recommendation is made to the Honorable Miranda M. Du, United States District Judge. The action was referred to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and the Local Rules of Practice, LR 1B 1-4.

Before the court is Defendants' Renewed Motion for Summary Judgment. (ECF Nos. 96, 96-1, 96-2.) Plaintiff filed a response. (ECF No. 98.) Defendants filed a reply. (ECF No. 101.)

After a thorough review, it is recommended that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

Plaintiff is an inmate in the custody of the Nevada Department of Corrections (NDOC), proceeding pro se with this action pursuant to 42 U.S.C. § 1983. (Second Amended Complaint (SAC), ECF No. 9.) The events giving rise to this action took place while Plaintiff was housed at Lovelock Correctional Center (LCC) and Northern Nevada Correctional Center (NNCC). (*Id.*) The remaining defendants are former NDOC Medical Director Dr. Romeo Aranas, Caseworker Dwayne Baze, Associate Warden Tara Carpenter, Nurse Katherine Hegge, Sergeant Bobby Preston, and LCC Nursing Director Don Poag.

On screening, Plaintiff was allowed to proceed with an Eighth Amendment deliberate indifference to serious medical needs claim against Dr. Aranas and Hegge, and an Eighth Amendment conditions of confinement claim against Preston, Poag, Carpenter and Baze in Count I. These claims are based on allegations that Plaintiff was born legally blind, and he requested transitional prescription eyeglasses, but his request was denied and Dr. Aranas and Hegge failed to do anything. Plaintiff was forced to attach a clip-on tinted lens to his prescription glasses in order to improve the vision in his right eye, and these were confiscated by Preston and Poag, who were aware of his vision issues. Carpenter and Baze were also aware of his vision issues, yet they still placed him on the top-tier. Without his glasses, he has blurred vision and injured himself while walking down the stairs. He alleges that Dr. Aranas and Hegge disregarded his need for transitional prescription eyeglasses, leaving him vulnerable to a risk of harm.

Plaintiff was also allowed to proceed with a Fourteenth Amendment due process claim in Count II against Baca, Powers, and Tristan, based on allegations he was improperly placed in administrative segregation for eight to nine months after he had been cleared to move back to general population following the investigation of his security threat group (STG) status. (Screening Order, ECF No. 5.)

Defendants previously moved for summary judgment. (ECF No. 61.) The court recommended that Defendants' motion be granted as to the due process claim in Count II, but denied without prejudice as to the Eighth Amendment claims in Count I because Plaintiff was not given time to review the medical records filed under seal that Defendants relied upon in support of their motion. (Report and Recommendation at ECF No. 88.) Following issuance of the report and recommendation, Plaintiff filed a motion to receive his medical records.

(ECF No. 90.) The court granted the motion and directed Defendants to provide Plaintiff, an indigent inmate, with the records at NDOC's expense in accordance with NDOC's Administrative Regulation (AR) 639.02(8). (ECF No. 91.)

District Judge Du adopted the report and recommendation on July 13, 2020, and gave Defendants 30 days to file a renewed motion for summary judgment as to the Eighth Amendment claims in Count I. (ECF No. 95.)

The court granted Plaintiff's motion for the appointment of a reader to assist him in this action, and inmate Timothy Johnson agreed to help Plaintiff. (ECF Nos. 83, 84.) The defense also filed Plaintiff's most recent medical records concerning his visual acuity under seal. (ECF No. 86-1.)

In their renewed motion for summary judgment, Defendants confirm that they sent the medical records filed in support of their motion, and the more recent eye exam records that were filed under seal, to the warden at LCC for Plaintiff to "kite" to review the records. (ECF No. 96 at 2, n. 1.) Their renewed motion argues that Baze, Carpenter, Preston, and Poag were not deliberately indifferent to serious threats to Plaintiff's safety because Plaintiff cannot demonstrate any of these defendants knew of and disregarded an excessive risk to his safety when his glasses were confiscated. In addition, they argue that Dr. Aranas and Nurse Hegge were not deliberately indifferent to his serious medical needs because his claim amounts to an assertion that he is unhappy with his state-issued glasses and there is no evidence that the failure to provide him with transition lenses caused the vision in his right eye to deteriorate. Alternatively, Defendants argue they are entitled to qualified immunity.

Defendants further assert that there is no longer a need for injunctive relief because NDOC's current Medical Directive 123 no longer prohibits inmates from wearing tinted lenses.

1   DAG Martin sent Plaintiff a letter on June 15, 2020, advising him of the change in policy, and

2   that he could obtain transition lenses at his next eye exam. (ECF No. 96 at 9, n. 9.)

3                                **II. LEGAL STANDARD**

4        The legal standard governing this motion is well settled: a party is entitled to summary

5   judgment when "the movant shows that there is no genuine issue as to any material fact and the

6   movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp.*

7   *v. Cartrett*, 477 U.S. 317, 330 (1986) (citing Fed. R. Civ. P. 56(c)). An issue is "genuine" if the

8   evidence would permit a reasonable jury to return a verdict for the nonmoving party. *Anderson v.*

9   *Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A fact is "material" if it could affect the outcome

10   of the case. *Id.* at 248 (disputes over facts that might affect the outcome will preclude summary

11   judgment, but factual disputes which are irrelevant or unnecessary are not considered). On the

12   other hand, where reasonable minds could differ on the material facts at issue, summary

13   judgment is not appropriate. *Anderson*, 477 U.S. at 250.

14        "The purpose of summary judgment is to avoid unnecessary trials when there is no

15   dispute as to the facts before the court." *Northwest Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

16   F.3d 1468, 1471 (9th Cir. 1994) (citation omitted); *see also Celotex,* 477 U.S. at 323-24 (purpose

17   of summary judgment is "to isolate and dispose of factually unsupported claims"); *Anderson,* 477

18   U.S. at 252 (purpose of summary judgment is to determine whether a case "is so one-sided that

19   one party must prevail as a matter of law"). In considering a motion for summary judgment, all

20   reasonable inferences are drawn in the light most favorable to the non-moving party. *In re*

21   *Slatkin*, 525 F.3d 805, 810 (9th Cir. 2008) (citation omitted); *Kaiser Cement Corp. v. Fischbach*

22   *& Moore Inc.*, 793 F.2d 1100, 1103 (9th Cir. 1986). That being said, "if the evidence of the

23   nonmoving party "is not significantly probative, summary judgment may be granted." *Anderson,*

477 U.S. at 249-250 (citations omitted). The court's function is not to weigh the evidence and determine the truth or to make credibility determinations. *Celotex,* 477 U.S. at 249, 255; *Anderson*, 477 U.S. at 249.

In deciding a motion for summary judgment, the court applies a burden-shifting analysis. "When the party moving for summary judgment would bear the burden of proof at trial, 'it must come forward with evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial.'… In such a case, the moving party has the initial burden of establishing the absence of a genuine [dispute] of fact on each issue material to its case." *C.A.R. Transp. Brokerage Co. v. Darden Rest., Inc.*, 213 F.3d 474, 480 (9th Cir. 2000) (internal citations omitted). In contrast, when the nonmoving party bears the burden of proving the claim or defense, the moving party can meet its burden in two ways: (1) by presenting evidence to negate an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party cannot establish an element essential to that party's case on which that party will have the burden of proof at trial. *See Celotex Corp. v. Cartrett*, 477 U.S. 317, 323-25 (1986).

If the moving party satisfies its initial burden, the burden shifts to the opposing party to establish that a genuine dispute exists as to a material fact. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The opposing party need not establish a genuine dispute of material fact conclusively in its favor. It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of truth at trial." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987) (quotation marks and citation omitted). The nonmoving party cannot avoid summary judgment by relying solely on conclusory allegations that are unsupported by factual data. *Matsushita*, 475 U.S. at 587. Instead, the opposition must go beyond the assertions and allegations of the

pleadings and set forth specific facts by producing competent evidence that shows a genuine

dispute of material fact for trial. *Celotex*, 477 U.S. at 324.

### III. DISCUSSION

**A. Injunctive Relief**

To the extent Plaintiff's pleading can be construed as seeking injunctive relief,

Defendants are correct that the request appears to be moot in light of the enactment of a new

version of Medical Directive 123, which Defendants represent no longer prohibits inmates from

wearing tinted lenses.

**B. Facts**

The following facts are undisputed unless otherwise noted:

Plaintiff is blind in his left eye, and has decreased visual acuity in his right eye. (ECF No.

61-2 at 36; ECF No. 61-2 at 19; Pl. Decl., ECF No. 98 at 28 ¶ 4.) Plaintiff claims that upon

entering NDOC he told unidentified medical and custodial staff of his vision issues. (Pl. Decl.,

ECF No. 98 at 28 ¶ 7.) It appears he was issued glasses on August 11, 2013. (*Id.*)

Plaintiff sent a kite on August 10, 2014, stating that he is legally blind in both eyes, and

the lenses he had were not correct and were not protecting what vision he had left. He indicated

that he needed a transitional lens that was extra dark. Poag responded on August 13, 2014: "We

do not issue transition lenses. Your current sunglasses are adequate." (ECF No. 61-1 at 13.)

Plaintiff asserts he purchased clip-on tinted lenses that were once sold in the NDOC store

for use with his glasses. (Pl. Decl., ECF No. 98 at 29 ¶ 10.)

According to Plaintiff, on February 21, 2015, when he was standing in line for pill call,

Poag directed Preston to confiscate Plaintiff's state-issued prescription glasses because he had

attached the clip-on sunglasses to them, claiming they were altered and unauthorized property. (Pl. Decl., ECF No. 98 at 29 ¶ 14.)

It is undisputed that Preston deemed Plaintiff's eyeglasses as altered and unauthorized property on February 21, 2015. (ECF No. 98 at 41.) Plaintiff asserts that Preston told him that Poag asked Preston to confiscate the glasses. Plaintiff begged Preston not to take the glasses because he is blind without his glasses. Plaintiff then asked Preston to just take off the clip-on portion and leave him with his glasses, but Preston said no. (Pl. Decl., ECF No. 98 at 29-30 ¶¶ 14-15.)

According to Plaintiff, around 8:15 p.m. that night, he left his cell with a bowl of food in his hand to go downstairs to heat it in the microwave, and as he was descending the stairs he slipped and fell and rolled down some of the stairs. An officer responded, and Plaintiff told the officer that his glasses had been taken from him, and he could not see the stairs to tell where to place his feet. (Pl. Decl., ECF No. 98 at 30 ¶¶ 17-18.)

Plaintiff submitted an emergency grievance that same day stating that a correctional officer took his glasses that he needs to see, and he fell down the stairs because he cannot see without his glasses. He asked that they be returned for his safety. The emergency grievance was denied, stating that the glasses were taken because they were altered. (ECF No. 61-1 at 24.)

The eye-glasses were issued back to Plaintiff without the clip-on tinted lenses on February 24, 2015, by the property room sergeant. (ECF No. 98 at 41; Pl. Decl., ECF No. 98 at 31 ¶ 19.)

Plaintiff submitted an informal level grievance on February 25, 2015, stating that his prescription eyeglasses were taken by Preston on February 21, 2021, and repeated what occurred. Plaintiff further explained that he had attached the tinted clip-on lens after medical said they did

not issue transitional lenses because he could not open his eyes all the way when faced with bright light. (ECF No. 61-1 at 14, 16-18.)

Hegge responded to the informal level grievance on April 2, 2015, stating that the glasses were taken as unauthorized, altered state property. She told Plaintiff that if he needed replacement glasses or to be evaluated for any medical concerns to submit a kite requesting an appointment. (ECF No. 61-1 at 15.)

Plaintiff filed a first level grievance on April 9, 2015. He stated that he had requested many appointments before to see the eye doctors and did not get any answers. He attached a copy of the kite he sent to Poag requesting transitional lenses, and Poag's response that they do not issue transition lenses. (ECF No. 61-1 at 13.) Plaintiff reiterated that he was born blind and could only see with his right eye with his glasses. He said his vision was getting worse and he needed an appointment with the eye doctor and to have the transitional lens issued. He repeated his claim that he had fallen after Poag ordered Preston to take his glasses, and he had told Preston he was legally blind and needed the glasses to see. He confirmed that the glasses had been returned, but without the tinted lens that he used to prevent the bright light from hurting his eyes and allowed him to open his eyes all the way. (ECF No. 61-1 at 5, 7-11.)

Poag responded at the first level, stating that the answer at the informal level was correct, and it did not matter who initiated the taking of the glasses because they were altered. (ECF No. 61-1 at 6.)

Plaintiff submitted a second level grievance, stating he was still in severe pain from falling down the stairs on February 21, 2015. (ECF No. 61-1 at 3.) Dr. Aranas responded to the second level grievance on June 10, 2015. He advised Plaintiff that the glasses were altered and

1  removed as unauthorized. He was told that if he was still experiencing physical problems due to

2  his fall, he could submit a kite to be evaluated. (ECF No. 61-1 at 2.)

3      X-rays of the cervical and lumbar spine and right knee were taken on March 5, 2015, and

4  were unremarkable. (ECF Nos. 63-2 at 7-9, 13.) On May 12, 2015, Dr. Gedney referred Plaintiff

5  to neurology after he fell and injured his neck and back and developed tremors and paresthesia in

6  his right leg. (ECF No. 63-3 at 2.) On July 6, 2015, Plaintiff reported that he felt weakness in his

7  right leg, discomfort in his neck, and quivering in his back following his fall. He was assessed

8  with probable compression of the cord at C6 level in his neck. (ECF No. 63-1 at 7.) He was

9  referred for an MRI of his cervical spine. (*Id*. at 5-6.)

10     He saw Dr. Seljestad, the optometrist, on July 22, 2015, who noted that Plaintiff was born

11 blind with cataracts at birth. He could perceive only light in his left eye, and experienced burning

12 and crying in the right eye that was worse with sunlight. He saw black spots, and they were

13 getting worse. Plaintiff was assessed with photophobia secondary to the congenital cataracts, and

14 Dr. Seljestad recommended tinted lenses. (ECF No. 63-3 at 14.)

15     On October 4, 2015, Plaintiff sent a kite, and was told that his neck MRI showed mild

16 changes and spondylosis. (ECF No. 98 at 37.) He was referred to neurology to evaluate signs and

17 symptoms of cervical cord compression after his fall. (ECF No. 63-3 at 12.)

18     Plaintiff saw Dr. John Lagios on November 13, 2015, for a neurologic evaluation of

19 symptoms involving the low back, right leg and neck. Plaintiff reported to Dr. Lagios that he fell

20 in February when he did not have his glasses and because of his poor vision he tripped going

21 down the stairs. Dr. Lagios assessed the neck pain as likely musculoskeletal and recommended

22 imaging of the spine, hip and SI joint, and that Plaintiff be prescribed Baclofen at night for sleep.

23 (ECF No. 63-3 at 7-9.) He was also referred for an MRI of the brain to evaluate for hyperreflexia

and right side weakening. (ECF No. 63-3 at 3-4.) He had normal lumbar spine radiographs revealing mild degenerative changes, as well as a normal MRI of the brain. (ECF No. 63-2 at 2-3.)

Plaintiff underwent an eye assessment on February 17, 2016, that showed the vision in the right eye *with glasses* was 20/10, but he could not see at all with the left eye. (ECF No. 61-2 at 26.) There is another notation on March 1, 2016, that Plaintiff was blind in the left eye and had decreased visual acuity in the right eye. (ECF No. 61-2 at 17.)

Plaintiff continued to complain of lumbar myofascial pain on July 27, 2016, that had not improved since his fall. (ECF No. 63-1 at 4.)

Plaintiff filed another informal level grievance on July 1, 2017. He said that on January 29, 2017, he had sent a kite to medical asking that his eyes be checked, and his eyeglasses were broken and he received no response. As of that time, he had not seen the eye doctor. He also complained he was still in pain from his fall. (ECF No. 61-8 at 11-16.) A non-defendant responded that Plaintiff was seen on August 18, 2017, which was the soonest possible appointment. (*Id.* at 10.) Plaintiff then filed a first level grievance, which also received a response that Plaintiff had been seen on August 18, 2017. (*Id.* at 8.) In the second level grievance, Plaintiff complained that he did not receive the transitional lenses that he needed. (*Id.* at 4-5.) Dr. Aranas responded at the second level, stating that he had reviewed each level of Plaintiff's grievance as well as his chart. Dr. Aranas advised Plaintiff that he had been seen and treated and was given Baclofen periodically, and he was given bifocals on September 16, 2017, as well as an order for artificial tears. Dr. Aranas told Plaintiff that if he had needs that were not being addressed he should submit a kite. (*Id.* at 3.)

Plaintiff's records confirm he was seen by the eye doctor on August 18, 2017. (ECF No. 63-1 at 4.) He appears to have been issued bifocal lenses on August 6, 2019. (ECF No. 86-1 at 8.) A notation on May 28, 2019, seems to suggest Plaintiff was prescribed or at least it was recommended that he receive bifocals with UV protection. (ECF No. 86-1 at 2.) He was given a pair of new glasses on August 29, 2019. (ECF No. 86-1 at 6.) On January 31, 2020, it shows that he was given single clear lens glasses. (*Id*. at 5.) On February 20, 2020, he received a pair of repaired glasses. (*Id*. at 4.)

Kara LeGrand is a Correctional Casework Specialist II and Associate Warden at LCC, and states that the stairs in housing unit 2 gave guard rails on both sides to assist in ascending and descending stairs, and those have been in place since at least January of 2015. She also states that Plaintiff had been housed in top tier cells at LCC prior to February of 2015. (ECF No. 96-2.)

**C. Eighth Amendment Medical Claim- Dr. Aranas & Hegge**

A prisoner can establish an Eighth Amendment violation arising from deficient medical care if he can prove that prison officials were deliberately indifferent to a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). A claim for deliberate indifference involves the examination of two elements: "the seriousness of the prisoner's medical need and the nature of the defendant's response to that need." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *rev'd on other grounds, WMX Tech, Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997); *see also Akhtar v. Mesa*, 698 F.3d 1202, 1213 (9th Cir. 2012) (quoting *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006)). "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin*, 974 F.2d at 1059 (citing *Estelle*, 429 U.S. at 104); *see also Akhtar*, 698 F.3d at 1213. Examples of conditions that are "serious" in nature include "an injury that a reasonable doctor or

patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *McGuckin*, 974 F.2d at 1059-60; *see also Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (citation omitted) (finding that inmate whose jaw was broken and mouth was wired shut for several months demonstrated a serious medical need).

If the medical need is "serious," the plaintiff must show that the defendant acted with deliberate indifference to that need. *Estelle*, 429 U.S. at 104; *Akhtar*, 698 F.3d at 1213 (citation omitted). "Deliberate indifference is a high legal standard." *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004). Deliberate indifference entails something more than medical malpractice or even gross negligence. *Id*. Inadvertence, by itself, is insufficient to establish a cause of action under section 1983. *McGuckin*, 974 F.2d at 1060. Instead, deliberate indifference is only present when a prison official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *see also Akhtar*, 698 F.3d at 1213 (citation omitted).

Deliberate indifference exists when a prison official "den[ies], delay[s] or intentionally interfere[s] with medical treatment, or it may be shown by the way in which prison officials provide medical care." *Crowley v. Bannister*, 734 F.3d 967, 978 (9th Cir. 2013) (internal quotation marks and citation omitted).

"A difference of opinion between a physician and the prisoner—or between medical professionals—concerning what medical care is appropriate does not amount to deliberate indifference." *Snow*, 681 F.3d at 987 (citing *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). Instead, to establish deliberate indifference in the context of a difference of opinion between a

physician and the prisoner or between medical providers, the prisoner "'must show that the course of treatment the doctors chose was medically unacceptable under the circumstances' and that the defendants 'chose this course in conscious disregard of an excessive risk to plaintiff's health.'" *Snow*, 681 F.3d at 988 (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Preliminarily, Defendants do not argue that Plaintiff did not suffer from a serious medical need: legal blindness in one eye and reduced visual acuity in the right eye (nor do they appear to dispute that he could not see out of the right eye without his glasses). The court notes that in *Colwell v. Bannister,* the Ninth Circuit held that monocular blindness, even though not life-threatening, was a serious medical need. *Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014). *Colwell* pointed out that other courts had concluded that inmates with other vision issues such as inmates who needed eyeglasses for double vision and loss of depth perception had a serious medical need. *Id.* (citing *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996)). Therefore, legal blindness in one eye and reduced visual acuity in the other, and essentially no vision without glasses, would certainly qualify as a serious medical need. Therefore, the court's analysis will focus on whether Defendants Hegge and Dr. Aranas were deliberately indifferent to this serious medical need.

There is no evidence in the record that Hegge knew about Plaintiff's visual issues prior to his fall. Instead, according to the evidence before the court, Hegge's only involvement was to respond to Plaintiff's informal level grievance. In the informal level grievance, Plaintiff's discussion of transitional lenses was limited to his statement that he had the idea to affix the clip-on lenses, because the dark lens allows him to open his right eye (his "only good eye") all the way so he can see better. (ECF No. 61-1 at 17-18.) The informal level grievance only requested

that Plaintiff be compensated for the pain he suffered as a result of his fall and to see a doctor for his injuries. (*Id.* at 18, 22.)

At that point, Plaintiff did not request the issuance of transitional lenses and he had already received his prescription eyeglasses back (albeit without the tinted clip-on lenses). Hegge told Plaintiff the glasses were taken as unauthorized, altered state property, and advised Plaintiff that if he needed replacement glasses or to be evaluated for his medical concerns to submit a kite requesting an appointment. There is no evidence that Plaintiff had any further contact with Hegge on the issue of the transitional lenses. Given that Plaintiff's grievance to Hegge was focused on seeing a doctor for his physical injuries for the fall and being compensated for those injuries, and did not request the return of the clip-on tinted lens that was confiscated or a new set of transitional lenses, the court does not find that she knew of and disregarded a serious risk to his health in responding to his informal level grievance. Therefore, summary judgment should be granted in Hegge's favor.

The court will now address the medical care claim with respect to Dr. Aranas.

In his second level grievance, Plaintiff stated that he was still in pain from the injuries he suffered from his fall. (ECF No. 61-1 at 3.) Dr. Aranas denied the second level grievance, reiterating that the glasses were altered. He advised Plaintiff that if he was still experiencing physical problems due to his fall, he should submit a kite to be evaluated. (ECF No. 61-1 at 2.) In responding to the second level grievance, Dr. Aranas would have reviewed the first level grievance which discussed the clip-on lenses, and requested the issuance of transitional lenses to help him see.

Roughly two years after Dr. Aranas denied the first grievance, Plaintiff initiated another grievance about his eye issues not being addressed and his pain from the fall. Part of his

requested relief was that he immediately see an eye specialist for an evaluation and that he be allowed transitional lenses to address the extreme eye irritation he was experiencing from brightness, which exposed him to a risk of injury. (ECF No. 61-8 at 16.) He was told at the informal level that he had been seen by the eye doctor on August 18, 2017. (ECF No. 61-8 at 10.) This was repeated in response to the first level grievance. (*Id*. at 8.) Plaintiff filed a second level grievance, stating he saw the eye doctor after two years, and reiterating that he did not receive the transitional lenses he needed. (*Id*. at 4.)

Dr. Aranas responded to the second level grievance stating that he had reviewed the grievance at all levels, as well as Plaintiff's chart. Insofar as Plaintiff's eyes were concerned, Dr. Aranas noted the optometrist appointments and orders, that Plaintiff had received new bifocals on September 16, 2017, and there was a new order for artificial tears on August 18, 2017. Finally, Dr. Aranas told Plaintiff that if he continued to fell that his medical needs were not being met, he should submit a kite for an appointment to address them. (ECF No. 61-8 at 3.)

Dr. Aranas did not mention the transitional lenses Plaintiff claimed he needed in the second level grievance.

Defendants argue that Plaintiff has presented no evidence that Dr. Aranas' failure to provide him with lenses caused his vision in his right eye to deteriorate.

The court disagrees. Dr. Aranas said he reviewed Plaintiff's chart; however, he did not reference the July 22, 2015 notes from Dr. Seljestad, who indicated that Plaintiff had photophobia[1] secondary to his congenital cataracts, and recommended tinted brown lenses.

---

[1] Photophobia is a sensitivity to light. It may make a person squint when faced with bright light indoors or outside. In addition, "[t]he sun or bright indoor light can be uncomfortable, even painful." *See* https://www.webmd.com/eye-health/photophobia-facts#1; https://www.healthline.com/health/photophobia, *last visited* Jan. 25, 2020.

Dr. Seljestad also noted that Plaintiff was experiencing burning crying that was worse with sunlight, as well as black spots. (ECF No. 63-3 at 14.) Plaintiff also stated in his initial grievance, which Dr. Aranas reviewed, that he needed transitional lenses to help him see because he could not fully open his "one good eye" when faced with bright light. Moreover, Plaintiff reported to Dr. Aranas in the second grievance that he needed the transitional lenses because was experiencing "extreme eye irritation" from brightness.

As such, the court finds Plaintiff has raised a genuine dispute of material fact as to whether Dr. Aranas was deliberately indifferent to Plaintiff's serious medical need.

Defendants generally argue, without pointing to any particular part of Plaintiff's response or evidence, that the court should disregard his response as self-serving and uncorroborated. "[D]eclarations are often self-serving, and this is properly so because the party submitting it would use the declaration to support his or her position." *Nigro v. Sears, Roebuck and Co.*, 784 F.3d 495, 497 (9th Cir. 2015) (citing *S.E.C. v. Phan*, 500 F.3d 895, 909 (9th Cir. 2007) (holding that district court erred in disregarding declarations as "uncorroborated and self-serving")). "Although the source of the evidence may have some bearing on its credibility, and thus on the weight it may be given by a trier of fact, the district court may not disregard a piece of evidence at the summary judgment stage solely based on its self-serving nature." *Id.*

"The district court can disregard a self-serving declaration that states only conclusions and not facts that would be admissible evidence." *Id.* (citing *Villarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1059, n. 5 (9th Cir. 2002) (court properly disregarded declaration that included facts beyond the declarant's personal knowledge); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997) ("A conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact.")). Plaintiff's

declaration consists mostly of factual statements, and not merely conclusions. The court does find, however, that some of Plaintiff's statements in his declaration are conclusory, and to the extent that is the case, the court has found, *infra*, that Plaintiff failed to raise a genuine dispute of material fact, for instance as to the liability of Baze and Carpenter.

In addition, Defendants argue they are entitled to summary judgment because Plaintiff has merely raised a difference of opinion as to whether he is entitled to transitional lenses. This is not a case of a difference of medical opinion because there is no evidence in the record demonstrating what Dr. Aranas' opinion on the transitional lenses was because he either deliberately ignored or neglected to address that aspect of Plaintiff's grievance.

Finally, Defendants argue that Dr. Aranas is entitled to qualified immunity because no clearly established law placed them on notice inmates have a constitutional right to prescriptive eyeglasses with transitional lenses, and Plaintiff received bi-focal glasses.

The qualified immunity analysis consists of two steps: (1) viewing the facts in the light most favorable to the plaintiff, did the defendant violate the plaintiff's rights; and (2) was the right clearly established at the time the defendant acted. *See Castro v. County of Los Angeles*, 833 F.3d 1060, 1066 (9th Cir. 2016) (en banc), *cert. denied*, 137 S.Ct. 831 (Jan. 23, 2017) ; *see also Hines v. Youseff*, 914 F.3d 1218, 1228-29 (9th Cir. 2019).

The issue is not whether Plaintiff has a constitutional right to transitional lenses, but whether a defendant knew of and disregarded a risk to Plaintiff's health in denying him the prescription transitional lenses. It was clearly established that when a prison official denies or interferes with medical treatment, the official violates the Eighth Amendment. *Crowley*, 734 F.3d at 978.  The evidence produced by Plaintiff shows that an optometrist did recommend transition glasses for his photophobia, Plaintiff advised Dr. Aranas of his need for transitional lenses, and

1  Dr. Aranas failed to address that request. A jury could interpret this as demonstrating that Dr.

2  Aranas knew Plaintiff required transitional lenses, but disregarded that need, which would

3  violate the Eighth Amendment. Therefore, Dr. Aranas is not entitled to qualified immunity, and

4  summary judgment should be denied as to Dr. Aranas.

5  **C. Eighth Amendment Conditions of Confinement- Preston, Poag, Carpenter & Baze**

6       The Eighth Amendment prohibits the imposition of cruel and unusual punishment. U.S.

7  Const. amend. VIII. Although conditions of confinement may be restrictive and harsh, they may

8  not deprive inmates of "the minimal civilized measures of life's necessities." *Rhodes v.*

9  *Chapman*, 452 U.S. 337, 347 (1981). Prison officials must provide prisoners with "food,

10  clothing, shelter, sanitation, medical care, and personal safety." *Toussaint v. McCarthy*, 801 F.2d

11  1080, 1107 (9th Cir. 1986), *abrogated in part on other grounds by Sandin v. Connor*, 515 U.S.

12  472 (1995).

13       Where a prisoner alleges injuries stemming from unsafe conditions of confinement,

14  prison officials may be held liable only if they acted with "deliberate indifference to a substantial

15  risk of serious harm." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998). The alleged

16  deprivation must be, in objective terms, "sufficiently serious." *Farmer v. Brennan*, 511 U.S. 825,

17  834 (1994) (citation omitted). In addition, the prison official must "know of and disregard an

18  excessive risk to inmate health or safety." *Id*. at 837.

19       Plaintiff sent a kite on August 10, 2014, requesting transitional lenses to help him see

20  with the vision he had remaining. Poag responded that they did not issue transitional lenses, and

21  that Plaintiff's current sunglasses were adequate. (ECF No. 61-1 at 13.) Poag did not explain how

22  his current sunglasses were adequate if Plaintiff also had to wear traditional glasses in order to

23  see.

Plaintiff's glasses were taken as unauthorized by Preston on February 21, 2015. Plaintiff states both in his grievance documentation as well as his declaration that Preston told him that it was Poag who had directed Preston to confiscate the glasses. Plaintiff maintains in his declaration that he begged Preston not to take his glasses because he was legally blind and could not see without them, and then asked Preston to only take the clip-on tinted lens, but Preston refused.

In addition, Poag denied Plaintiff's first level grievance, stating that it did not matter who initiated the taking of the glasses because the glasses were altered. The statement that it did not matter who initiated the taking of the glasses was presumably referring to Plaintiff's assertion that it was Poag who had directed Preston to take the glasses.

First, the evidence is undisputed that Plaintiff is blind in one eye and has reduced visual acuity in the other eye. Moreover, Plaintiff has presented evidence that he cannot see out of his "one good eye" without his glasses. Therefore, the evidence reflects that depriving him of his eyeglasses was a sufficiently serious deprivation, or at the very least Plaintiff has raised a genuine dispute of material fact as to this issue.

Next, there is evidence that Poag knew via Plaintiff's kite that Plaintiff was legally blind and wanted transitional lenses for his remaining vision. Plaintiff states in his declaration that Preston told him that Poag had ordered him to confiscate Plaintiff's glasses. Defendants offer no declaration of Poag responding to this assertion, but his grievance response does not deny that this was the case. If Poag ordered Preston to confiscate eyeglasses from an inmate who he knew was legally blind without his glasses, a jury could find that Poag was deliberately indifferent to a risk to Plaintiff's safety as Plaintiff obviously would not be able to see without his glasses.

19

Plaintiff has also presented evidence that he informed Preston he was legally blind and could not see without his glasses, and that he asked Plaintiff to just take the clip-on lenses but Preston refused. Defendants provide no response to this evidence. A jury faced with this evidence could determine that Preston knew of and disregarded a serious a risk to Plaintiff's safety in confiscating his glasses knowing Plaintiff was legally blind without them.

Defendants argue that they are not his doctors and would not know about his asserted vision deficiency, but Plaintiff has presented evidence that he specifically advised both Poag and Preston of his blindness. This is sufficient to create a genuine dispute of material fact as to what Poag and Preston knew.

Defendants also argue that Plaintiff had been housed in top tiers before and should have known how to walk downstairs with or without his glasses and there were guard rails on the stairs. Plaintiff has produced evidence that without his glasses he could not see, which raises a dispute of fact as to whether he could safely navigate the stairs. While Defendants contend that Plaintiff cannot demonstrate any Defendant knew Plaintiff could not negotiate the stairs without glasses, it seems obvious that if you take away glasses from someone who cannot see without them, they may have difficulty ascending or descending stairs.

Defendants contend they are entitled to qualified immunity because even if Plaintiff's glasses were confiscated and he fell down the stairs, case law did not indicate the actions of the Defendants violated the constitution. The case law was clear, however, that if a defendant knew of and disregarded a serious risk to an inmate's safety, he violated the Eighth Amendment. In addition, the risk of taking away the glasses from an inmate who would be blind without them seems to be so obvious that no reasonable officer would have concluded it was constitutionally permissible. *See e.g. Taylor v. Riojas*, 141 S.Ct. 52 (2020); s*ee also Williams v. ICC Comm.*, 812

1  F. Supp. 1029, 1032 (N.D. Cal. 1992) (allegation that inmate was deliberately deprived of

2  eyeglasses when he was legally blind stated a cognizable Eighth Amendment claim).

3        Therefore, summary judgment should be denied as to Poag and Preston.

4        As to Carpenter and Baze, Plaintiff states in his declaration that they knew or should have

5  known that Plaintiff was blind in one eye and could barely see out of the other eye, and as such,

6  they should have placed him in a bottom bunk on the bottom tier. (ECF No. 98 at 33 ¶ 25.)

7        Plaintiff's suspicion that Carpenter and Baze knew of his blindness is insufficient to

8  create a genuine dispute of material fact that they were deliberately indifferent to his safety,

9  which requires evidence of the subjective element. While Plaintiff insinuates that the redacted

10  portions of his case file *could* discuss his blindness, he has still produced no evidence that Baze

11  and Carpenter were aware of his blindness. Nor does he point to specific evidence that they were

12  responsible for placing him on the top tier in a top bunk. Even if he did point to such evidence,

13  he would also have to show that they did so knowing that plaintiff was without his glasses, so as

14  to create a risk to his safety. Plaintiff has not done so. Therefore, summary judgment should be

15  granted in favor of Carpenter and Baze.

16                          **IV. RECOMMENDATION**

17        IT IS HEREBY RECOMMENDED that the District Judge enter an order **GRANTING**

18  Defendants' motion for summary judgment as to the Eighth Amendment claims against Hegge,

19  Carpenter, and Baze, and **DENYING** the motion for summary judgment as to the Eighth

20  Amendment claims against Dr. Aranas, Poag, and Preston.

21        The parties should be aware of the following:

22        1. That they may file, pursuant to 28 U.S.C. § 636(b)(1)(C), specific written objections to

23  this Report and Recommendation within fourteen days of being served with a copy of the Report

and Recommendation. These objections should be titled "Objections to Magistrate Judge's Report and Recommendation" and should be accompanied by points and authorities for consideration by the district judge.

2. That this Report and Recommendation is not an appealable order and that any notice of appeal pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure should not be filed until entry of judgment by the district court.

Dated: January 27, 2021

_____
William G. Cobb
United States Magistrate Judge